I will probably reserve a few minutes. I don't think I have ten minutes worth of things to mention. Good morning. Good morning. Your Honors, my name is Derek Tavani. I am here representing Muradyan, the defendant, counterclaimant, and the appellant in this case. I don't have a whole lot to add to the briefing. I think the briefing was fairly extensive. A couple of points I wanted to mention. One is that the District Court repeatedly referenced a case specific to Insurance Company v. Kent and read that case as allowing the agent and broker to step into the shoes of the insurance company. I think we have discreted that argument. The Civic Insurance Company v. Kent doesn't stand for that. There is no other case so holding. The relationship between the insured and the agent and broker is different than between the insured and the insurer. The insurer has different obligations and different liabilities than the agent and broker does and vice versa. That is one thing. I think when you take that case out, the legal basis for the District Court's decision pretty much falls. The second thing the District Court did, and also the appellees did in their briefs, was they cherry-picked the evidence in their favor. When you have two or three competing versions of the same events, all with citations to the record, and I submit at least some of them are accurate citations to the record, it would indicate to you that there is a dispute as to the facts and that is not something that should have been resolved on summary judgment. It is something that should have been resolved on a trial. I think one of the things the District Court did was to actually determine credibility, adversely to my client of course, and they kind of disguised that by indicating the dispute was immaterial. I think one of the more glaring indications of that is a lot of this case came down to whether or not there was a checkbox, who checked the box, no motor vehicle violations in five years. There was evidence from Mr. Goldberg that he checked the box based upon a conversation he had with my client, Mr. Marotti, and Mr. Marotti denied ever having any such conversation. The District Court references that and makes the decision that my client's version is immaterial because it doesn't make any difference, and goes back to Kent saying he's got his obligation. Unfortunately... Well, that says to me, fall back to this, I don't know, Uber, May, Fiday, so that it doesn't really matter whether he understood the M, even, you know, assuming that he didn't understand the MVR, you know, giving him all of those inferences, isn't what the court's saying that that particular principle, I mean, he does admit that he knows he has these, you know, that he has moving violations, and he does admit that he knows that they're relevant to the insurance process, and the District Court just says, well, under that duty, that swallows all of that up, assuming all that to be true. Well, two points. One is that he disclosed it, and the second thing is that in terms of California law, at least, I think it's Insurance Code 1900, makes that duty reciprocal. I'd appreciate it if you keep your volume up a little bit. Sorry. You kind of are fading away into the past. Insurance Code 1900 makes that duty reciprocal, and why it makes a difference in this case is that what the binder says is that the binder's effective upon a satisfactory driving record. My client would have absolutely no knowledge of what a satisfactory driving record would be. Are you saying, though, that the reciprocal duty, that they have a duty to investigate? No, they have a duty of utmost good faith and disclosure. The same as my client has. Because if they had a duty to investigate on that, that would be good for you. Well, they actually had a contractual duty to investigate. Their own guidelines indicated they had to run a motor vehicle report prior to binding the loss and prior to submitting it to the carrier. They did not run it prior. They ran it subsequent, and that was part of the exhibit that we used in the Opposition to Motion for Summary Judgment. And the exhibit actually showed, the motor vehicle driving record from their own file showed that my client had, over a five-year period, four moving violations and one non-moving violation. What their guidelines show was that the DUI or drug-related driving conviction just blew you out in terms of getting insurance. My client didn't have any of those. He had a restricted license after the time in question and during the time the examination under oath was taken. And what I'm saying about the obligation for mutual, utmost good faith, was that the two defendants or cross-defendants were obligated to inform my client of what a satisfactory driving record was because my client would have no way of knowing whether it made a difference if it was three tickets or four tickets triggered the line or four tickets or five tickets or whether it was just the DUI. There was no evidence from the defense side that his driving record was, in fact, unacceptable to the carrier. What weight does one give to the fact that this was not the first insurance company he'd approached and that the earlier company, as I recall, jacked up the rates or whatever because of his driving record? I don't know why they jacked up the rates. That's an inference you can't draw from this evidence. They were quoted $18,000. Well, what did your client say? I think that's the, you know, what did he say about moving violations and driving record and what he, you know, I mean, what comes out of his mouth is obviously significant. We don't know what he told Progressive because I don't think that's in the record. But what did he say? What he said. What is in the summary judgment? What he told Lohmeyer orally was, I have tickets. I don't know how many. No, I'm talking, but he had a deposition, too, right? He had an examination under oath, which is the equivalent. And what he said was the same thing. He thought he had five. Actually, he had four moving violations, but he said he thought he had five. And that's what he said in his examination under oath. And there's no reason he would have told Lohmeyer anything any different had Lohmeyer questioned him about the number of moving violations that he had. And I think Meradian expected him to run a motor vehicle record. And if that was significant, they could have found out because he simply didn't know exactly. He was wrong in terms of how many he had. He overestimated the number he, in fact, had. But he did say certain things about what he knew about insurance and what he knew moving violations meant. That's in the record. He runs a tow truck company and a body shop. He does insurance, works with insurance companies. He knows it's not unimportant, although how important it is for marine insurance, he can't tell. In terms of what he did with Progressive, he had prior insurance through Progressive. This was a different kind of boat. It was a much faster boat, for one thing. But in fact, the prior boat he had was insured for $2,000 and Progressive went to $18,000. This farmer's agent quoted him $3,200. And in fact, even after the accident in question, with a suspended or restricted license, he got insurance for the boat for $5,000. So the $3,200 may not have been an out of the realm of possibility insurance quote. And you've got one over here, $18,000, one over here that says $32,000, and I think I've disclosed the same information to both of them. Which one are you going to take? It is not so shocking in comparison to what his prior coverage was or what his subsequent coverage was for $5,000. He should have been aware that it must have been based on a misunderstanding of the facts. Is the subsequent coverage in the record? Yes. It's in the record. I know you're going to ask me to find it while they're talking. I will find it for you on rebuttal. It was in the record because I read it in my brief, and I wouldn't have put it in the brief if it wasn't in the record. I just remember the reference. Any other questions? I will find it. Thank you. Thank you. Good morning. Keith Lamar on behalf of George Lohmeyer, Jr., the FLE. I believe we've had this matter completely briefed, and I believe the district court's opinion is very extensive and addresses each issue which our motions relied upon. Additionally, the deposition transcripts have been asserted in the appendix, which is before this court, which doesn't rely on anyone's memory here today, but clearly memorializes Mr. Moravia's misrepresentations. So I will submit on the documents before this court unless this court has any questions. Okay. Thank you. Thank you. Good morning. Frances O'Meara on behalf of Total Dollar Management. I will reiterate what Mr. Lohmeyer's counsel has said with respect to the findings by the district court on this matter. I do have a couple of points that I would like to address that was raised by Mr. Moravia's counsel. The record will cite at the joint appellate appendix, page 531 through 532, that Mr. Moravian knew that he had a bad record, that he knew the checkbox that requests the MVR should have been yes, quote, because I have a bad record. So he knew he had a bad record. He knew that he should have put yes on the MVR checkbox, but he didn't. He also knew that – Well, let me ask you this. If we were to think that there was a question of fact regarding whether he knew that his automotive accident was material or whether he knew what it was meant by MVR, can we still affirm the district court judgment under any other theory? Yes. And that would be? That would be the theory that he knew and has admitted with no contradictory evidence that he backdated the application and never disclosed the automobile accident that he – or the claim that he had on August 8th. And he knew he didn't disclose that. He knew it was fraud. And on that basis alone, the district court's rulings should be affirmed. The evidence also is undisputed by Mr. Moravian's own testimony, however, that he knew that the – Let me ask you that since you said that. For purposes of argument, can we say that arguably backdating an insurance application is not material to insuring the risk? Why is that relevant here? I maintain that it is relevant. Well, I'm asking you why. Because the underwriter guidelines require the application, which is submitted to be part of the application process, to have proper and complete and accurate information. The fact that they had prior records, which, by the way, is undisputed in the declaration of Cy Goldberg, submitted as part of the moving parties papers, say that that was material to the risk. By the way, Mr. Moravian's counsel points to an underwriter guideline that is not affirmed, it is not authenticated, and it is not accurate to apply in this situation. The underwriter guideline that he refers to is at JAA231, which specifically excludes high-performance vehicles, including the scarab involved in this matter. The underwriter guidelines that is applicable is referenced in Mr. Goldberg's declaration at JAA123, and it says that you do need to have an NVR, you do need to have at most a prior accident that doesn't involve a major claim. So by the underwriter guidelines and the criteria there, that creates the materiality with respect to the application and the right to rescind. And if you have no further questions. Thank you very much. That case seemed very simple. Thank you very much. Thank you for your time. Seem. The devil is in the details, however. That's for sure. Thank you. The reference is in Mr. Meradian's examination under oath. It appears in the joint appendix by the appellees at pages 459 and 477. He indicates he got subsequent insurance through a mercury agent on a progressive policy, which doesn't seem to make any sense to me, but mercury insurance between 5,000 and 6,000 a year. Okay. Thank you. In terms of responding to Ms. O'Meara, what the facts showed was that after the August 8th accident, he calls up and speaks to Lohmeyer Sr., Lohmeyer Jr.'s agent, because Lohmeyer Jr. is out of town. That's when the application is completed, but it's after the accident. And the accident is disclosed at the same time. He calls up and says, I've got an accident. I don't even have a policy yet, but I've got an accident. And what Lohmeyer Sr. says is we've got to have the application back. Well, do I put the accident on it? No. What date do I put it? You backdate it to the date before the accident happened and send it in. One, there's an estoppel argument. Lohmeyer shouldn't be able to use what he instructed my client to do as a way to get out of this obligation. But the second thing, and I think just as important, is by the time the application comes in, the accident's already happened. If my client hadn't sent the application back, what difference would the position be? If he had put on the accident and properly dated it and crossed off the no motor vehicle thing within five years, which he said, by the way, he didn't understand what NVR meant at the time. Now he does. English is not his first language. But if he had done that and sent it back in, could they still escape the obligation? In other words, what difference does the application make that comes back in three weeks subsequent to the event for which you're claiming insurance? And if you look at his actual record, his motor vehicle record didn't disclose any automobile accidents within a five-year period. It disclosed the four tickets. His only insurance claim was a vandalism claim, and he did disclose that, and that was on the application. There was no attempt to be dishonest. There were mistakes made, which he admitted. If I had realized this, I would have corrected it. It's wrong information. I shouldn't have given that information because it's wrong. I don't think that vitiates the obligations of the defendants or counter-defendants to get the information right, take the information they were actually given and put it on the application correctly, and follow their own guidelines, which say you've got to have a motor vehicle record before you bind this. They should have simply said to my client, we can't bind this for a while. He'd have left the silly thing in the lot. He never would have taken it out. There's no reason to take a $200,000 boat out that doesn't have coverage. It's like driving your Ferrari down the street without insurance. My agent says I don't have insurance. It stays on my driveway until I've got coverage. This accident did happen really on the first time that he hauled the boat somewhere? Yes, I think the second time. It didn't even happen on the water. It wasn't even an at-fault automobile accident for him. Somebody cut him off, and the boat came off the trailer. Any other questions? No, thank you. Thank you so much for your time. It is an interesting case, and we appreciate the candor of counsel. You don't always have to use your time. We have read the briefs, and we'll continue to look at them and the record. So thank you very much.
judges: Gibson , Fisher, Callahan